UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THRESHOLD ENTERPRISES LTD.,
Plaintiff,

v.

PRESSED JUICERY, INC.,
Defendant.

Case No. 19-cv-03716-JSW

**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**
Re: Dkt. No. 23

Now before the Court for consideration is the motion for judgment on the pleadings filed by Defendant Pressed Juicery, Inc. ("Pressed Juicery"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the motion suitable for disposition without oral argument. *See* N.D. Civ. L.R. 7-1(b). For the reasons set forth below, the Court GRANTS Pressed Juicery's motion for judgment on the pleadings with prejudice.

**BACKGROUND**

Threshold Enterprises, Ltd. ("Threshold") sells various vitamin and dietary supplements under its "Source Naturals" brand. (Dkt. No. 1 (Complaint) ¶¶ 6, 9-10.) Threshold owns federal trademark registrations for "wellness shots" (U.S. Reg. No. 3,073,471) and "wellness shot" (U.S. Reg. No. 4, 405,519) in conjunction with "dietary supplements," and sells a product marked as "wellness shot." (*Id.* ¶¶ 9, 10 and Ex. B.) Threshold's products are both marketed on its website[1] and sold through retailers. (*See id.* ¶ 7.) Threshold markets its "wellness shot" as providing "immune support." (*See id.* ¶ Ex. B.)

The registration for "wellness shots" disclaims the exclusive right to use the word "wellness" apart from the full mark. (Dkt. No. 13 (Answer and Counterclaim) ¶ 14 and Ex. D.) The registration for "wellness shot" disclaims the exclusive right to use the word "shot" apart from the full mark. (*Id.* ¶ 14 and Exs. C and D.)

---

[1] Threshold's website is http://www.sourcenaturals.com. (Dkt. No. 1 (Complaint) ¶ 7.)

Pressed Juicery sells multiple products through its store locations and its website including nutritional "shots" containing ingredients associated with purported health and wellness benefits.[2] (*See id.* ¶ 12 and Ex. C; Dkt. No. 13 (Counterclaims) ¶ 8.) Examples of "shots" Pressed Juicery sells include a probiotic shot, a vitality shot, and a "wellness shot." (Dkt. No. 13 (Counterclaim) ¶¶ 2, 9.) Pressed Juicery's "wellness shot" contains ingredients believed to convey certain health benefits. (*Id.* ¶ 10.)

On June 26, 2019, Threshold sued Pressed Juicery over Pressed Juicery's use of "wellness shot." Threshold brought claims for (i) federal trademark infringement, (ii) common law trademark infringement, (iii) violation of California Business & Professions Code section 14300 (dilution), (iv) federal unfair competition, and (v) common law unfair competition under California Business & Professions Code section 17200. (*Id.* ¶¶ 17-42.) On September 13, 2019, Pressed Juicery filed an answer, affirmative defenses, and counterclaims for (i) declaratory judgment of non-infringement and (ii) cancellation. (Dkt. No. 13.) On September 18, 2019, Threshold answered Pressed Juicery's counterclaims. (Dkt. No. 15.)

**ANALYSIS**

**A.     Applicable Legal Standard.**

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion for judgment on the pleadings challenges the legal sufficiency of the claims asserted in a complaint. For the purposes of a Rule 12(c) motion, the Court must accept the allegations of the non-moving party as true. *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (internal citations omitted). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) ("The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing. Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its

---

[2] Pressed Juicery's website is: http://pressedjuicery.com. (Dkt. No. 1 (Complaint) ¶ 12.)

2

1   Rule 12(c) analog.")

Generally, a court may not consider any material beyond the pleadings in ruling on a Rule 12(c) motion, but a "court may consider facts that are contained in materials of which the court may take judicial notice." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (internal quotations and citation omitted). A court may also consider documents attached to the pleadings. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). In this regard, a court need not accept as true any allegations that are contradicted by judicially noticeable facts. *In re Google Inc.*, No. 13-md-2430-LHK, 2013 WL 5423918, at *5 (N.D. Cal. Sept. 26, 2013) (citing *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000)). A court is not required to assume the truth of conclusory allegations or of unwarranted inferences. *Id.* (citations omitted).

**B.      Requests for Judicial Notice.**

Under Federal Rule of Evidence 201, a court must take judicial notice of certain facts "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Rule 201 allows a court to take judicial notice of facts that are "not subject to reasonable dispute because [they] (1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Both Threshold and Pressed Juicery ask the Court to take judicial notice of a plethora of documents. Neither party's requests are opposed, and neither party questions the authenticity of any of the materials submitted by the other. The Court therefore briefly analyzes each party's request.

Pressed Juicery asks the Court to take judicial notice of each of the exhibits (Exhibits A-I) attached to its Answer and Counterclaims. (*See* Dkt. No. 13.) Pressed Juicery also asks the Court to take judicial notice of 121 exhibits to the Declaration of Aaron Wais ("Wais Decl.") which Pressed Juicery submitted in support of its motion for judgment on the pleadings. (*See* Dkt. No. 24 and 24-1 (Wais Decl. and Exs.).) All of these documents fall into the following categories: (i) screenshots and printouts of websites of the parties and other third parties not involved in this

3

1  lawsuit, social media websites, and information and news websites (Exhibits A, B, F, G, and H to
2  Answer and Counterclaims and Exhibits 1-117 to Wais Decl.), (ii) trademark registrations and
3  office actions for "wellness shot" and "wellness shots," and other registered trademarks, retrieved
4  from the United States Patent and Trademark Office's ("USPTO") document retrieval system
5  (Exhibits C, D, and I to Answer and Counterclaims and Exhibits 118-121 to Wais Decl.), and (iii)
6  a printout from an online dictionary (Exhibit E to Answer and Counterclaims). Threshold asks
7  this Court to take judicial notice of 161 exhibits to the Declaration of Monty Agarwal ("Agarwal
8  Decl."). (*See* Dkt. No. 29, 29-1, 29-2 (Agarwal Decl. and Exs.).) These documents fall into the
9  following categories: (i) screenshots and printouts of websites of the parties and other third parties
10  not involved in this lawsuit, social media websites, and information and news websites (Exhibits
11  1-152) and (ii) printouts of documents retrieved from the USPTO's document retrieval system
12  (Exhibits 153-161).

13  Materials in the online files of the USPTO and other matters of public record are proper
14  subjects of judicial notice. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th
15  Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."
16  (citation omitted)); *Caiz v. Roberts*, 382 F. Supp. 3d 942, 947 (C.D. Cal. 2019) (taking judicial
17  notice of "File History" downloaded from USPTO website). The Court therefore takes judicial
18  notice of Exhibits C, D, and I to the Answer and Counterclaims, Exhibits 118-121 to the Wais
19  Decl., and Exhibits 153-161 to the Agarwal Decl.

20  In general, websites and their contents may be judicially noticed. *Pac. Overlander, LLC v.*
21  *Kauai Overlander*, No. 18-cv-2142-KAW, 2018 WL 3821070, at *2 (N.D. Cal. Aug. 10, 2018)
22  (citing *Caldwell v. Caldwell*, No. 05-cv-4166-PJH, 2006 WL 618511, at *4 (N.D. Cal. Mar. 13,
23  2006) (". . . [A]s a general matter, websites and their contents may be proper subjects for judicial
24  notice.") and *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 984 (N.D. Cal. 2010));
25  *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, No. 16-cv-1304-JVS-DFM, 2016 WL 4487895, at *1 n.1
26  (C.D. Cal. Aug. 23, 2016) (taking judicial notice of thirty-four online news articles and social
27  media posts "solely for their existence and content, and not for the truth of any statements in the
28  documents."). The Court therefore takes judicial notice of Exhibits A, B, F, G, and H to the

4

1  Answer and Counterclaims, Exhibits 1-117 to the Wais Decl., and Exhibits 1-152 of the Agarwal

2  Decl.

3  Dictionary definitions are also a proper subject for judicial notice. *Gonzalez v. Guzman*,
No. 17-cv-21-GPC-BGS, 2017 WL 5446087, at *3 n.4 (S.D. Cal. Nov. 14, 2017) (citation omitted); *see also Rugg v. Johnson & Johnson*, No. 17-cv-5010-BLF, 2018 WL 3023493, at *3 n.3 (N.D. Cal. June 18, 2018) (granting request for judicial notice of dictionary definitions). Accordingly, the Court also takes judicial notice of Exhibit E to the Answer and Counterclaims.

All told, the parties have asked the Court to take judicial notice of approximately 700 pages of documents. Notably, the parties have not asked the Court to take judicial notice of *particular facts or statements* within these documents or the fact that these documents contain certain information. Yet, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1000 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019). The Court therefore concludes it is appropriate to take judicial notice only of the contents in the submitted documents that are relevant to the issues presented in the motion for judgment on the pleadings—and only of the contents of these documents the Court specifically references in its analysis below. To the extent the Court takes judicial notice that these documents contain certain information, the Court notices only the fact that the documents contain the referenced content. The Court does not take judicial notice of the truth of that content.

The parties are not the first to ask this Court to take judicial notice of voluminous materials without identifying the specific contents pertinent to their arguments. In fact, dumping large swaths of material into a request for judicial notice has become commonplace. This catch-all approach to requesting judicial notice, however, is not consistent with the law's requirements. *Id.* at 999 ("A court must also consider—and identify—which fact or facts it is noticing from [a document]."). The Court advises counsel for the parties to tailor their future requests for judicial notice and to identify the specific contents or facts contained in documents of which they wish the Court to take notice.

Further, the parties' briefs make oblique references to the documents attached to their requests for judicial notice, but, with few exceptions, do not draw the Court's attention to the pertinent contents of these documents. For example, after discussing a handful of specific examples of social media use of "wellness shot," Pressed Juicery then refers the Court to Exhibits 9-31 for a "representative sampling of more than twenty Instagram posts." Pressed Juicery also refers the Court to Exhibits 37-56 for a "representative sampling of twenty similar generic uses of 'wellness shot' in online articles and publications, dated between 2013 and 2015." Threshold makes similar asides, referring the Court to Exhibits 56-135 and 136-52 for social and traditional media usage of alternative terms. In essence, the parties have asked the Court to do much of the heavy lifting, ferreting out the pertinent passages for which each document was selected. The Ninth Circuit has long embraced the maxim that "[j]udges are not like pigs, hunting for truffles buried in briefs." *Indep. Towers of Wash. v. Wash.,* 350 F.3d 925, 929 (9th Cir.2003) (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)). The Court advises counsel for the parties to keep this in mind.

Finally, Threshold makes passing reference to this Court's obligation, when considering documents "outside the pleadings," to transform the motion for judgment on the pleadings to a motion for summary judgment. Yet, each of the documents were (i) attached to the complaint or the answer and/or (ii) documents the Court judicially noticed. Examining such documents in a motion for judgment on the pleadings does not transform the motion into one for summary judgment. *Yang v. Dar Al-Handash Consultants*, 250 F. App'x 771, 772 (9th Cir. 2007). Moreover, documents attached to an answer may be considered in a motion for judgment on the pleadings where (i) the documents are central to the claims and (ii) where the authenticity of the documents is not disputed. *Id.*; *Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002); *LiveIntent, Inc. v. Naples*, 293 F. Supp. 3d 433, 441 (S.D.N.Y. 2018). Threshold has not argued that the documents attached to Pressed Juicery's answer and counterclaims are not central to the claims or questioned the documents' authenticity. Therefore, even if the Court had not taken judicial notice of the documents attached to Pressed Juicery's answer and counterclaims, the Court could have incorporated these documents into its analysis without converting the instant motion

6

1  into one for summary judgment.

2  **C.     Genericism.**

Foundational to any claim for trademark infringement is the existence of a valid and enforceable mark: "[v]alidity is a threshold issue." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002). Accordingly, to defend against allegations of trademark infringement, an accused infringer may argue the trademark at issue does not deserve protection. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).

Trademark protection depends on the strength of the putative mark, which courts will place into one of four categories: (i) generic, (ii) descriptive, (iii) suggestive, and (iv) arbitrary or fanciful. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (quoting *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979)). Suggestive, arbitrary, or fanciful terms are "inherently distinctive," and, accordingly, once a term is so classified, the term is entitled to trademark protection. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979). A term falling into the descriptive category may be protectable as a trademark, but only if the term has acquired "secondary meaning." *Surgicenters*, 601 F.2d at 1014-15. Without a showing of "secondary meaning," a descriptive term is "merely descriptive" with no acquired distinctiveness. *Id.* Generic terms never receive trademark protection because they indicate only the type of the good "of which the particular product . . . is a species" rather than "the source of a product." *Elliott v. Google, Inc.*, 860 F.3d 1151, 1155 (9th Cir. 2017), *as amended* (citation and internal quotation marks omitted).

A court determines whether a mark is generic by (i) identifying the category of goods or services to which the mark is meant to apply and (ii) analyzing whether the relevant consuming public's primary perception of the mark is as a source of a product or as a type, category, or kind of product. *Filipino Yellow Pages*, 198 F.3d at 1147. Courts in the Ninth Circuit sometimes refer to this as the "who-are-you/what-are-you" test. *See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929 (9th Cir. 2005) (quoting *Filipino Yellow Pages, Inc.*, 198 F.3d at 1147). If the relevant public primarily understands a mark as describing "who" a particular good or service is, or where it comes from, then the mark is valid. *Id.* However, if the relevant

7

consuming public primarily understands the mark as describing "what" the particular good or service is, then the mark is or has become generic. *Id.* Put another way, in determining whether a term is generic, courts must ask whether "the primary significance of the term in the minds of the consuming public is the product [and not] the producer." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938). To determine that a term is generic, is it not enough that the term has some significance to the public as the name of an article; the primary significance of the term must be generic. *E.g.*, *Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 481 (S.D.N.Y. 2014) (citation omitted).

Because both of Threshold's marks are federally registered, they are entitled to a presumption of validity and Pressed Juicery has the burden of demonstrating that the marks do not deserve protection. *See Tie Tech, Inc.*, 296 F.3d at 783. Further, Threshold's trademarks are "incontestable." 15 U.S.C. § 1065. The effect of incontestability is that the marks may only be cancelled upon a finding that the mark has "become[] . . . generic," the mark was abandoned, the registration was obtained fraudulently, or the mark was used to misrepresent the source of the goods or services. *Park 'N Fly*, 469 U.S. at 194-95, 197 (1985) (discussing 15 U.S.C. §§ 1064, 1065). Pressed Juicery argues only that the marks are generic. By introducing evidence to demonstrate that the marks are generic, Pressed Juicery may rebut the marks' presumption of validity, even though the marks are incontestable. *See* 15 U.S.C. §§ 1064, 1065. The marks' incontestability has no bearing on whether the marks are in fact generic. *In re Cordua Rests., Inc.*, 823 F.3d 594, 599–600 (Fed. Cir. 2016) (". . . [I]ncontestability is irrelevant to the question of genericness.")

The Court here confronts an interesting analytical snag. Pressed Juicery does not argue that the marks have *become* generic. In fact, Pressed Juicery explicitly disclaims this argument. Pressed Juicery argues instead that the marks have always been generic and should never have been registered. Yet, §§ 1064(3) and 1065 only allow cancellation of an incontestable mark that has "become generic." If Pressed Juicery is not arguing that the marks have "become generic," it does not seem as though Pressed Juicery can prevail on its challenge to the incontestable marks. However, under § 1065(4), a mark cannot become "incontestable" where the mark "is the generic

8

name for the goods or services . . . for which it is registered." Under this statutory provision, if "wellness shot" and "wellness shots" were always generic, and the USPTO's registrations were inappropriate, the marks never acquired incontestability. Pressed Juicery's position, then, undermines itself. It has disclaimed genericide[3], which would seem to put cancellation under § 1064(3) out of its reach. And yet, Pressed Juicery has conceded that the marks are incontestable, which would seem to circumvent its ability to argue that the marks were always generic.

The prevailing concern in declining to confer trademark protection to generic terms is that allowing the party seeking protection to monopolize such language would prevent competitors from adequately describing their own products. *E.g.*, *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 618 (9th Cir. 1993); *Closed Loop Mktg., Inc. v. Closed Loop Mktg., LLC*, 589 F. Supp. 2d 1211, 1220 (E.D. Cal. 2008). The harm in affording protection to a generic term is the same whether the mark became generic or whether the term was always generic. Further, whether the circumstances suggest genericide or genericism, the Court must examine the primary significance of the mark to the relevant consuming public. *Compare Elliott*, 860 F.3d at 1156 (applying primary significance test in case where analyzing whether registered mark had become generic) *with Filipino Yellow Pages,* 198 F.3d at 1147-51 (applying primary significance test where mark not registered, and court analyzed whether mark deserved protection). Given the underlying policy reasons for affording generic terms no protection, it would be unwise to let generic marks retain protection due to what appears to be an analytical technicality. *Cordua Rests.*, 823 F.3d at 600 ("Incontestability is never a shield for a mark that is generic." (citation omitted).) Accordingly, the Court now evaluates the parties' evidence of the marks' primary significance.

Pressed Juicery's evidence consists of dictionary definitions of the components of the marks, social media posts using the term "wellness shot," media usage of "wellness shot," competitor usage of "wellness shot," and office actions and registrations of "wellness shot(s)" and of other marks. Essentially, Pressed Juicery has submitted every form of evidence courts analyze

---

[3] "Genericide" describes a protectable trademark's transformation into a generic term that no longer indicates source. Genericide occurs when the public "appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source." *Elliott*, 860 F.3d at 1156.

9

when determining whether a mark is generic—every form of evidence, that is, except a survey of relevant consumers, which would not be judicially noticeable. *See Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. 06-cv-0827-AG-RNB, 2008 WL 1913163, at *4 (C.D. Cal. Mar. 27, 2008) (listing types of evidence courts evaluate to determine genericness), *aff'd*, 327 F. App'x 723 (9th Cir. 2009). The evidence Pressed Juicery has adduced all shows that the consuming public uses "wellness shot" generically—as a type of product rather than as a source for a particular product.

In determining genericness, courts place "significant but not controlling weight" on dictionary definitions. *Filipino Yellow Pages*, 198 F.3d at 1148 (discussing *Surgicenters*, 601 F.2d at 1015 n.11). Dictionary definitions are "not determinative," but are "relevant and often persuasive in determining how a term is understood by the consuming public." *Surgicenters*, 601 F.2d at 1015 n.11. The Court must balance the usefulness of dictionary definitions of constituent parts of compound marks with the anti-dissection rule. The anti-dissection rule teaches that a Court should analyze the mark by viewing it as a whole, "as [the mark] appears in the marketplace." *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1391 (9th Cir. 1993). However, examining the dictionary definitions of a mark's components does not necessarily undercut the anti-dissection rule. By examining the dictionary definitions of a mark's components, a court can ascertain whether the resulting mark uses the individual words in a way different from their common meaning. *See Premier Nutrition*, 2008 WL 1913163, at *4-5. And if the resulting mark's meaning is not different from its constituent parts, and those parts are generic, "then the compound word too has been proved generic." *In re Am. Fertility Soc'y*, 188 F. 3d 1341, 1347 (Fed. Cir. 1999). By examining the definitions of "wellness" and "shot," the Court can therefore create an analytical baseline for determining whether the resulting mark, as used by Threshold, the public, and competitors, has a different meaning than its constituent parts.

Pressed Juicery has submitted dictionary definitions for "wellness" and "shot." "Wellness" is defined as "the quality or state of being in good health," and "shot" is defined as "a small measure or serving (such as one ounce) of undiluted liquid or other beverage." (Dkt. No. 13 (Answer and Counterclaims) Ex. E.) Pressed Juicery has explained that the term "wellness

shot(s)" is what one would expect it to be, given the definition of "wellness" and "shot:" a small serving of a drink that has purported health benefits. *See In re Gould Paper Corp.*, 834 F.2d 1017, 1018 (Fed. Cir. 1987) (affirming genericness of "screenwipe" in reference to computer and television screen cleaning cloths due in part to fact that compound term had meaning identical to constituent parts). Pressed Juicery also points out that the nature of Threshold's "wellness shot(s)" product—a 2.5 oz. drink marketed to "power . . . immunity"—is consistent with the combined dictionary definitions of "wellness" and "shot."[4] (Dkt. No. 1 (Complaint) Ex. B.) The dictionary definitions of "wellness" and "shot" tend to show that, when combined into "wellness shot(s)," the individual words retain their dictionary meanings. Because there is "nothing" incongruous about Threshold's combination of the components as applied to the category of product at issue, the dictionary definition evidence tends to show the components are at least descriptive of the characteristics of the products the marks cover and that the composite marks are therefore generic. *See Gould*, 834 F.2d at 1018 (compound mark generic because descriptive aspect of components "not lost in combined form").

Threshold has argued that the compound mark is not a mere amalgamation of the components because the product itself is not a small drink containing literal wellness. However, such rigid interpretation is unwarranted and is inconsistent with the USPTO's treatment. The USPTO required disclaimer of separate use of "wellness" before "wellness shots" could be registered because the goods covered by "wellness shots" were "*designed and used to promote and further* wellness in those individuals who consume them." (Dkt. No. 13 (Answer and Counterclaims) Ex. D (emphasis added).) In other words, with respect to the mark "wellness shot," the USPTO concluded that "wellness" conveyed the "promotion" and "furtherance" of wellness, not just wellness itself.

Threshold has also argued that Pressed Juicery used the dictionary definitions of "wellness" and "shot" impermissibly to argue that the marks are "merely descriptive." *See*

---

[4] The correct question, of course, is not whether "wellness shot(s)" is generic as applied to Threshold's own product but rather whether the term is *understood by the public* to refer to the category of the product. *See Cordua Rests.*, 823 F.3d at 602 (citations omitted). As discussed below, the majority of Pressed Juicery's evidence demonstrates as much.

11

*Park 'n Fly*, 469 U.S. at 205 (infringement of incontestable mark cannot be defended by arguing mark is merely descriptive). Of course, to point out that components of a mark are descriptive is not the same as contending that a composite mark made from those components is merely descriptive. Genericism is the "ultimate in descriptiveness:" it is therefore perfectly logical to point out the descriptive qualities of a term to support an argument that the term evokes a class or type of product rather than a source or brand. *See Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1366 (Fed. Cir. 2018) (citation omitted).

If dictionary evidence were the only evidence Pressed Juicery presented, Threshold's criticism would be well-taken. But the dictionary definition evidence is but a small part of the big picture.

Pressed Juicery has also provided several examples of media usage of "wellness shot." How media outlets use a term is helpful in genericness analysis because the media "often has its finger on the pulse of the general public." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1189-90 (C.D. Cal. 2007) (usage in "popular press" evidence of genericism). Accordingly, courts consider media usage of a term strong evidence of the public's understanding. *See Filipino Yellow Pages*, 198 F.3d at 1151 (usage of term in newspaper article evidence of genericness); *see also CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1028–29 (N.D. Cal. 2008) (citation and quotation omitted).

Here, the media examples introduced by Pressed Juicery use the term "wellness shots" to describe a type of beverage, not to refer to Threshold's brand of product. *See id.* at 1029 (making same observation about media usage of term at issue). For instance, one article states that "Lots of brands have introduced wellness shots to the market, claiming they'll improve sleep, boost immunity, and more." (*See* Dkt. No. 13 (Answer and Counterclaims) Ex. F.) The article's use of "wellness shots" to refer to a type of product is obvious, as the article refers to "lots of brands" producing "wellness shots." The writer of another piece proclaims: "I'm all about wellness shots . . . . While these shots are available at juice bars or health food stores, . . . [the] good news is you can churn 'em out right at home." (Dkt. No. 24 (Wais Decl.) Ex. 34.) This article also does not use "wellness shot" as an indicator of source but, rather, to evoke a type of beverage product

12

that is available from multiple purveyors and possible to create at home. Other articles Pressed Juicery submitted make similar statements. (*See* Dkt. No. 24 (Wais Decl.) Ex. 35 (describing diet plan as "superfood shakes, super shots, and wellness shots"); Ex. 37 (summarizing offerings at a juice bar in Dallas: "The Lovers Lane juice bar offers fresh, cold-pressed juices, blends[,] and smoothies; Holy Kombucha on tap; and wellness shots like aloe vera, chlorophyll, vitamins B12 and d3, and glucosamine.") These periodicals come from a variety of sources: industry publications, fitness publications, food and health blogs and publications, newspaper articles, and online "print" versions of news television segments.

Pressed Juicery has also introduced multiple examples of usage from third parties and competitors. *See Classic Foods*, 468 F. Supp. 2d at 1190 ("Federal courts also view usage of the term by competitors in the industry as strong evidence of how the public perceives the terms."); *Closed Loop*, 589 F. Supp. 2d at 1219 n.6 ("Significant use of a term by competitors in the industry has traditionally been recognized as indicating genericness.") For example, Pressed Juicery points to Instagram ads for beverage products made by competitors that describe their small, pre-made beverages with nutritional benefits as "wellness shots." (*See, e.g.*, Exs. 59, 60, 61, 62 to Wais Decl.)[5] It is clear to the Court from these examples that multiple companies use "wellness shot" not to reference the product that Threshold sells, but to describe a type of small beverage with purportedly healthy ingredients.

Pressed Juicery has also submitted dozens of examples of Instagram users' use of "wellness shot" to describe a type of beverage. Some Instagram users provide recipes for homemade "wellness shots." For instance, one Instagram user posted a photo of a tangerine-

---

[5] Pressed Juicery has also pointed to Threshold's own use of the terms on its website. (*See* Dkt. No. 24 (Wais Decl.) Exs. 1, 2.) Exhibit 1 is an article on the Source Naturals website. This article does not demonstrate generic use of "wellness shot" because, while the term "wellness" appears multiple times, "wellness shot" and "wellness shots" are absent. The use of the entire term, not its severed components, is what illustrates whether the term is being used as an indicator of source or to reference a type of product. *See Official Airline Guides, Inc.,* 6 F.3d at 1391. Likewise, Exhibit 2 is a product listing for a Source Naturals product called "Maqui Berry Blend Shot Mix." The product description claims: "This unique superfruit mix supports immune, cardiovascular, and cognitive health, to help maintain overall wellness. Take a shot anytime to add a little flavor to your day." This example, like Exhibit 1, does not illustrate Threshold's use of the terms, only that Threshold uses the terms' parts generically.

13

colored beverage in a small glass and wrote "If you need an extra healthy pick-me-up, try this simple wellness shot!" (Dkt. No. 24 (Wais Decl.) Ex. 3.) Another Instagram user posted an image of raw ingredients and an orangey beverage in a small glass with the comment, "This vitamin C wellness shot is just the ticket to boost your immune system and keep ya feelin' snazzy." (Dkt. No. 24 (Wais Decl.) Ex. 4.) Yet another example is a post by an Instagram user that contains a recipe for a "wellness shot," followed by an endorsement that the poster has "a quick wellness shot" every morning. (Dkt. No. 24 (Wais Decl.) Ex. 9.) These examples demonstrate that "wellness shot" is being used generically, not as an indicator of source.

Finally, Pressed Juicery submits documents obtained from the USPTO's document retrieval system. Pressed Juicery explains that the USPTO required Threshold to disclaim exclusive rights to the words "wellness" in the registration for "wellness shots" and "shot" in the registration for "wellness shot" and required other companies to disclaim these individual components in registrations for beverage products. (Dkt. No. 13 (Answer and Counterclaims) Exs. C and D; Dkt. No 24 (Wais Decl.) Ex. 18 (requiring registrant to disclaim "wellness" in application for beverage product purporting to contain dietary and nutritional supplements); Dkt. No. 24-1 (Wais Decl.) Exs. 119-21 (requiring registrants to disclaim "shot" or "energy shot" in applications for beverage product).) The USPTO's treatment of a term in other applications is material to a Court's analysis of a term's genericness. *See Filipino Yellow Pages*, 198 F.3d at 1148 (examining USPTO's treatment of "Filipino" on the one hand and "yellow pages" on the other and concluding both terms were generic). These examples tend to show that the individual components ("wellness" and "shot") are generic, but, because the Court must examine the mark in its entirety, are not necessarily determinative of whether "wellness shot" is generic. *See id.* ("The issue then becomes whether combining the generic terms 'Filipino' and 'yellow pages' to form the composite term 'Filipino Yellow Pages' creates a generic or a descriptive term.").

However, the USPTO's treatment of "wellness shot" warrants greater consideration. It is telling that the USPTO has accepted at least three trademark applicants' use of the term "wellness

shot" in the applicants' identification[6] of their goods and services. Applicants are not allowed to include another party's registered mark in their goods and services identification. If an applicant's product identification includes another party's registered mark, the examiner must "require that [the mark] be deleted and that generic wording be substituted." TMEP § 1402.9.

The USPTO approved registration for the word mark "holy juice" (registered after "wellness shot(s)"), where the application identified the applicant's goods and services as "bar services featuring organic foods and beverages, namely, juices, smoothies, acai bowls, wellness shots, wellness water, and organic ingredient additions that may be added to the food and beverages." (Dkt. No. 13 (Answer and Counterclaims) Ex. I.) The USPTO also accepted the use of "wellness shots" in at least two other applications submitted after "wellness shot" and "wellness shots" were registered. (*See id.* (registrations for "dreamer Miami" and "dreamer acai juice matcha bar" for "restaurant services featuring smoothies, fresh juices, matcha, coffee, chai, wellness shots, bowls, overnight oats, sandwiches, wraps, and salads." ).) Yet, the USPTO has refused registration for at least one trademark application (for "daily dose wellness shot") due in part to the "wellness shot(s)" marks. (*See* Dkt. No. 29-2 (Agarwal Decl.) Ex. 153.)

This inconsistent treatment of "wellness shot" is puzzling. But, even assuming that allowing "wellness shots" to remain in the registrations for "holy juice," "dreamer Miami," and "dreamer acai juice matcha bar" constituted mere errors, the mistakes are illustrative of the way in which the public encounters and understands "wellness shot(s)." Because the examiner approved the applications, the Court may deduce that the examiner understood the applicants (third parties and quasi-competitors) to be using "wellness shots" to refer to a type of beverage product, not a particular brand or source of a beverage product. *See* TMEP §§ 1402.1, 1402.9. This suggests that the terms are generic.

The documents Threshold submitted as evidence that its "wellness shot(s)" marks are not generic consist almost entirely of examples of alternate terms for the type of product that the term

---

[6] When applying to register a trademark, an applicant must provide an identification of its goods and services. This identification must set forth the "common names" of the applied-for goods and services "using terminology that is generally understood" by the public. *See* Trademark Manual of Examining Procedure ("TMEP") § 1402.1.

15

"wellness shot" encompasses. (Dkt. No. 29 (Agarwal Decl.) ¶ 3 ("This declaration sets forth counterevidence showing the use of other phrases such as 'juice shots,' 'immunity shots,' 'probiotic shots,' 'functional shots,' 'ginger shots' 'vitality shots,' 'power shots,' 'wellness blast, 'SuperShotTM,' 'Superfood ShotTM,' and many others to describe the goods.").) Yet, for the purposes of analyzing whether a term is generic, the existence and widespread use of alternative terms is immaterial. What is important is public understanding of the *terms at issue*. *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F. 2d 577, 580 (2d Cir. 1963 ("[T]he test [for genericness] is not what is available as an alternative to the public, but what the public's understanding is of the word that it uses."); *see* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2019) § 12:9 ("The existence of synonyms for a term does not mean the term is not generic." (citations omitted)).

Multiple courts have rejected the notion that the existence of alternative terms inoculates against genericism of a particular term. *E.g.*, *Filipino Yellow Pages*, 11 F.3d at 1148-50 (determining "Filipino Yellow Pages" generic despite alternative term such as "Filipino telephone directory").[7] In the face of Pressed Juicery's mountain of evidence that "wellness shot" is being used generically, Threshold has not submitted one piece of evidence—with the exception of Threshold's own product label and packaging—demonstrating that "wellness shot" is understood as an indicator of source. In fact, some of the documents Threshold submitted demonstrate additional generic use of "wellness shot." For example, a product marketed by Akiva Superfoods as a "Lemon Honey Cinnamon Juice Shot" is described as a "wellness shot." (*See* Dkt. No. 29 (Agarwal Decl.) Ex. 2; *see also* Ex. 24 (product description on Amazon describing product not offered by Threshold as "wellness shot"); Ex. 25 (customer review describing product offered by company called Smart Pressed as "Immunity wellness shot"); Ex. 32 (products not offered by Threshold described as Amazon's choice for "wellness shots").)

The Court recognizes that it is somewhat unusual to find that a mark is generic at the

---

[7] It is also immaterial that other users of "wellness shots" have transitioned to using alternate terms. *See White Swan v. Nature Co.*, No. 93-cv-35213, 1994 WL 374232, at *4 (9th Cir. July 15, 1994) ("[W]e reject White Swan's suggestion that Nature Co. should be required to change its seed can labels because other competitors of White Swan have done so. Because one competitor has made a compromise to avoid a lawsuit does not impel all other competitors to do so.").

16

pleading stage because genericism is a matter of fact. *See Yellow Cab Co. of Sacramento*, 419 F.3d at 929 (whether mark is generic is question of fact). But such a determination is not without precedent. *See, e.g.*, *Closed Loop*, 589 F. Supp. 2d at 1220 (granting motion to dismiss after examining judicially-noticed documents and concluding mark generic); *Image Online Design, Inc. v. Internet Corp. for Assigned Named and Numbers*, No. 12-cv-8968-DDP-JC, 2013 WL 489899, at *7-8 (C.D. Cal. 2013) (granting motion to dismiss after determining proposed mark ".WEB" was generic for internet services); *Whipple v. Brigman*, No. 12-cv-258, 2013 WL 566817, at *4-5 (W.D.N.C. Feb. 13, 2013) (granting motion for judgment on the pleadings after finding mark generic); *Energy Intelligence Grp., Inc. v. UBS Fin. Servs., Inc.*, No. 08-cv-1497-DAB, 2009 WL 1490603, at *4-6 (S.D.N.Y. 2009) (granting motion to dismiss because mark generic).

Under the circumstances, a finding that "wellness shot" and "wellness shots" are generic is appropriate. The evidence Pressed Juicery submitted is the type of evidence upon which courts rely when determining genericness. And the evidence before the Court suggests overwhelmingly that both terms are generic. Threshold has not demonstrated there is a genuine dispute of material fact as to whether "wellness shot" is generic because nothing in Threshold's complaint, answer to Pressed Juicery's counterclaims, or the documents Threshold has submitted to the Court in support of its opposition suggests that "wellness shot" is understood by the public to refer to Threshold's product rather than to a type of product. *See Yellow Cab Co. of Sacramento*, 419 F.3d at 929-30 (holding summary judgment inappropriate where party produced evidence demonstrating genuine issue of material fact concerning whether term "yellow cab" was generic). Pressed Juicery has rebutted the strong presumption of validity due these incontestable marks, and judgment on the pleadings is appropriate.

**D.    Fair Use.**

Even if the marks were protectable, Pressed Juicery's use of "wellness shot" is fair use. Among the several permissible defenses to an "incontestable" mark is the fair-use defense. 15 U.S.C. § 1115(b)(4). The fair use defense applies where an alleged infringer uses the mark "otherwise than as a mark" and "fairly and in good faith" to describe to users goods and services. *Id.* The "good faith" requirement asks whether the defendant, in adopting the term, intended to

17

capitalize on the plaintiff's goodwill. *See Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067, 1076 (C.D. Cal. 2012). A motion to dismiss may be granted due to a fair use defense. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1467 (9th Cir. 1993); *Architectural Mailboxes, LLC v. Epoch Design, LLC*, No. 10-cv-974-DMS-CAB, 2011 WL 1630809, at *4 (S.D. Cal. April 28, 2011) (granting motion to dismiss trademark infringement on fair use grounds).

Here, "wellness shot" appears on Pressed Juicery's product underneath Pressed Juicery's prominent house mark, which is a filled-black circle containing the words "Pressed Juicery," the apparent slogan "Get Back to Your Roots," and a drawing of a stick or a root, all in white. (*See* Dkt. No. 1 (Complaint) Ex. C.) "Wellness shot" is in a different typeface and appears in boldface, black, and lowercase text. Underneath "wellness shot" is a list of the drink's ingredients: ginger, lemon, and cayenne. The font of the list of ingredients appears to be the same as the font of "wellness shot," but the ingredients are not listed in boldface.

The label here is remarkably similar to the label at issue in *Murad, Inc. v. KaplanMD, Inc.*, No. 08-cv-6069-GAF-AJW, 2009 WL 10672037, at *5 (C.D. Cal. Mar. 27, 2009). In that case, Murad accused KaplanMD of trademark infringement due to KaplanMD's use of Murad's "perfecting serum" mark on a label for one of Murad's products. "Perfecting serum" appeared below the KaplanMD house mark on the label, above the words "phytogenic triactive complex," which referenced the product's ingredients. *Id.* The Court concluded it was "reasonably apparent" that the use of the "perfecting serum" mark was meant to distinguish the particular KaplanMD product from other products KaplanMD sold—not to suggest affiliation or endorsement by Murad. *Id.* The court further concluded that "perfecting serum" was not particularly attention-grabbing because it was in a similar font to KaplanMD's house mark. *Id.*

It is clear from the label that "Pressed Juicery" and not "wellness shot" communicates the source of Pressed Juicery's product. *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (observing non-trademark use "evidenced by the fact that the source of the defendants' product [wa]s clearly identified by the prominent display of the defendants' own trademarks.") The Pressed Juicery house mark is much more attention-grabbing

18

than the other components of the label because it is heavily stylized, differently colored, and prominently featured at the top of the label. Further, as in *Murad*, Pressed Juicery uses "wellness shot" to differentiate from other "shots" it offers, including a "vitality shot" and a "probiotic shot." (*See* Dkt. No. 13 (Answer and Counterclaims) Ex. A.) Pressed Juicery's product label uses "wellness shot" only to describe the nature and type of Pressed Juicery's product.

Moreover, the "Pressed Juicery" label is also markedly different from the Threshold Source Naturals "wellness shot" product. (*See* Dkt. No. 1 (Complaint) Ex. B.) The Threshold product is an opaque, blue-and-white bottle with "Source Naturals" appearing in a wave-banner in small but capitalized white font near the top of the bottle. "Wellness shot" appears in the center of the bottle in a similarly shaped, but larger, black banner. There is nothing about the Pressed Juicery label for its "wellness shot" product that suggests Pressed Juicery is attempting to traffic on Threshold's goodwill. *See Fortune Dynamic, Inc. v. Victoria Secret Stores Brand Mgmt. Inc.*, 618 F.3d 1025, 1040 (9th Cir. 2010) ("To determine whether a term is being used as a mark, we look for indications that the term is being used to 'associate it with a manufacturer.'").

Finally, apart from conclusory allegations concerning malice and ill will, there is nothing in the pleadings or in the voluminous documents before the Court to suggest that Pressed Juicery's use of "wellness shot" was in bad faith. Threshold suggests that Pressed Juicery's continued use of "wellness shot" after Threshold contacted Pressed Juicery to alert Pressed Juicery to the brewing conflict constitutes bad faith. However, continued use in this circumstance does not show bad faith because Pressed Juicery used the term descriptively. *See, e.g.*, *CG Roxane LLC,* 569 F. Supp. 2d at 1033-34

Even if "wellness shot" and "wellness shots" were not generic, Pressed Juicery's use was fair as a matter of law.

**CONCLUSION**

All of Threshold's claims are predicated on the validity of the marks and on the nature of Pressed Juicery's use of the marks. Accordingly, for the reasons explained above, the Court HEREBY GRANTS Pressed Juicery's motion for judgment on the pleadings with prejudice. Because "wellness shot" and "wellness shots" are generic, they are unenforceable, and therefore,

the Court HEREBY ORDERS cancellation of the registration of these marks. *See Gracie v. Gracie,* 217 F.3d 1060, 1065–66, 1072 (9th Cir. 2000) (court must cancel registration after finding underlying mark is unenforceable). A separate judgment will issue, and the Clerk may close the file.

**IT IS SO ORDERED.**

Dated: April 7, 2020

_____
JEFFREY S. WHITE
United States District Judge